IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| In re Bausch & Lomb Inc. Contacts Lens Solution Products Liability Litigation | ) ) ) ) | MDL No. 1785 |
| *This order relates to:* | ) ) | C/A No. 2:06-MN-77777-DCN |
| Skandros v. Bausch & Lomb, Inc., C/A No. 2:06-CV-02659-DCN | ) ) ) ) | **ORDER and OPINION** |
| Solo et al v. Bausch & Lomb, Inc., C/A No. 2:06-CV-02716-DCN | ) ) ) ) | |

This matter is before the court on defendant's motion to dismiss plaintiffs' amended consolidated class-action complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Plaintiffs allege they have suffered an economic loss as a result of alleged defects in ReNu with MoistureLoc ("ReNu"), a contact-lens solution manufactured by defendant. To that end, they have asserted various contract-based claims under New York, California, and Pennsylvania law individually and on behalf of a purported class of ReNu purchasers. The named plaintiffs seek to represent a class comprised of all persons nationwide who purchased ReNu from September 1, 2004 to April 10, 2006 or, alternatively, all persons in California and Pennsylvania who purchased ReNu during that period.

## I.  BACKGROUND

On a motion to dismiss, the court must take the complaint's well-pleaded factual allegations as true and draw all reasonable inferences in the plaintiffs' favor. McNair v.

1

Lend Lease Trucks, Inc., 95 F.3d 325, 327 (4th Cir. 1996). The statement of the facts in this case is made accordingly.

Defendant manufactured ReNu with MoisturLoc, a multipurpose contact-lens solution that cleans and disinfects contact lenses. The Food and Drug Administration (FDA) approved ReNu in May 2004 and Bausch & Lomb released the solution for sale to the American public in September 2004. ReNu was released for sale in Asia, including Hong Kong, Singapore, and Malaysia, shortly thereafter.

Plaintiffs allege ReNu was defective because it caused or had the propensity to cause fusarium keratitis. Fusarium keratitis is a fungus that causes a serious infection to the cornea, sometimes resulting in significant damage to the eyes. Treatment for fusarium keratitis requires a quick administration of antifungal medication and/or surgery to remove the fungus. Without proper treatment, fusarium keratitis can cause severe vision loss or blindness, and necessitate corneal transplants.

Health officials in Asia were the first to link ReNu with fusarium keratitis. In April 2006, Singapore's Ministry of Health issued a press release stating that seventy-five cases of fusarium keratitis had been reported in contact-lens wearers between November 1, 2004 and April 12, 2006. This was a sharp increase over the January 1, 2004 to October 31, 2004 period, during which only two cases of fusarium keratitis were reported. The press release linked the outbreak to ReNu and encouraged consumers to stop using the solution. Officials in Hong Kong subsequently requested that defendant remove ReNu from stores.

Around March 2006, the Centers for Disease Control (CDC) noticed an increased

number of fusarium keratitis cases in the United States. A CDC study fully investigated thirty cases, and found that twenty-six of twenty-eight patients who wore soft contact lenses also used ReNu. The CDC and FDA issued a joint press release on April 10, 2006, noting that wearers of soft contact lenses were at risk of being infected with fusarium keratitis. The same day, defendant announced that it was ceasing shipments of ReNu to retailers in the United States. Three days later, on April 13, 2006, defendant asked retailers to stop selling ReNu to consumers and recommended that consumers switch to another solution. The FDA issued a statement supporting defendant's decision to withdraw ReNu.

On August 14, 2006, the Judicial Panel on Multi-District Litigation consolidated cases relating to ReNu for pretrial proceedings and assigned the Multi-District Litigation (MDL) to this court. Plaintiffs Azalea Solo, Susan McKay, and John Skandros are residents of California who purchased ReNu with MoisturLoc during the class period. Plaintiff Meghan Eveland is a Pennsylvania resident who also purchased ReNu during the class period. Solo, McKay, and Eveland filed their suits directly in the MDL. Skandros filed his suit in the Central District of California and it was later transferred here pursuant to 28 U.S.C. § 1407. They generally allege that ReNu was defective in that it caused or had the potential to cause fusarium keratitis and that defendant knowingly sold defective ReNu to consumers and misled consumers into believing that ReNu was safe during the class period. Plaintiffs have asserted twelve causes of action:

(A) Under New York law: (1) breach of the implied warranty of merchantability, N.Y. U.C.C. § 2-314; (2) violation of New York's Unfair Trade

Practices Act, N.Y. Gen. Bus. Law § 349 et seq.; and (3) unjust enrichment.

(B)     Under California law: (1) violation of the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1791 et seq.; (2) breach of the implied warranty of merchantability, Cal. Com. Code § 2314; (3) violation of Cal. Bus. & Prof. Code § 17200 et seq. for unfair and deceptive trade practices; (4) violation of Cal. Bus. & Prof. Code § 17500 et seq. for false advertising; (5) violation of the Consumer Legal Remedies Act, Cal. Civ. Code § 1750 et seq.; and (6) unjust enrichment.

(C)     Under Pennsylvania law: (1) breach of the implied warranty of merchantability, 13 Pa. Cons. Stat. § 2314; (2) violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 Pa. Con. Stat. § 201-1 et seq.; and (3) unjust enrichment.

## II.   DISCUSSION

### A.     Choice of Law

Defendant first argues that plaintiffs cannot assert claims under New York law because those claims are barred by the relevant choice-of-law principles. The court agrees that plaintiffs' New York claims should be dismissed.

A federal district court sitting in diversity applies the substantive law of the state in which it sits. Erie R. Co. v. Tompkins, 304 U.S. 64, 78-79 (1938). As part of that principle, the federal court must also apply the forum state's choice-of-law principles. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). However, when cases are transferred from another district, the transferee court applies the law of the state in which the transferor court is located. Van Dusen v. Barrack, 376 U.S. 612, 639 (1964)

("[W]here the defendants seek transfer, the transferee district court must be obligated to apply the state law that would have applied if there had been no change of venue. A change of venue under § 1404(a) generally should be, with respect to state law, but a change of courtrooms.").

While those principles are ordinarily simple to apply, the procedures of an MDL significantly complicate their application. This MDL includes three types of cases: cases that have been transferred from another district pursuant to 28 U.S.C. § 1407, cases that originated in South Carolina and were directly filed in the MDL, and cases that originated outside South Carolina and were directly filed in the MDL.[1] The Erie rule is easily applied to transferred cases and directly filed cases that originated in this district. But that rule is more difficult to apply to the substantial number of cases that, but for the MDL proceedings, would have been filed in a district other than the District of South Carolina. A straightforward application of Erie would require this court to apply South Carolina law in those cases, yet it would be an odd result to subject plaintiffs to South Carolina law simply because they took advantage of the direct filing procedure–a procedure that provides benefits to all parties and preserves judicial resources.

At least one other district court has acknowledged the problematic choice-of-law issues presented by the direct filing of "foreign" MDL cases. In the In re Vioxx Products Liability Litigation, Judge Eldon Fallon addressed the concern noted above, but also

---

[1] Pretrial Order No. 5 provides that Bausch & Lomb has waives any objections of improper venue and allows for direct filing of cases in the "District of South Carolina that emanate from districts outside the District of South Carolina that would appropriately be included in this multidistrict litigation proceeding."

elaborated on how direct filing affects the choice-of-law once cases are transferred back to their "home districts" for trial, stating:

> Direct filing will also create another oddity when cases are eventually transferred to the plaintiffs' home districts for trial, as the traditional "transferor"/"transferee" roles will be reversed. At that point in time, the MDL court will be considered the "transferor" court and the local trial courts will be considered "transferee" courts. In light of Ferens v. John Deere Co., 494 U.S. 516 (1990), the local "transferee" courts may be faced with the odd duty of applying the law of the MDL forum, including the MDL forum's choice-of-law rules, especially if the MDL forum could exercise personal jurisdiction over the defendant.

See In re Vioxx Prods. Liab. Litig., 478 F. Supp. 2d 897, 904 n.2 (E.D. La. 2007). Although a stipulation might prevent such a result, the parties have not stipulated as to what substantive law applies either before or after transfer in these proceedings. Although it is important to be mindful of these issues, this motion can be decided without answering these questions because no conflict exists among the potentially applicable choice-of-law principles. South Carolina, California, and Pennsylvania law would all require dismissal of plaintiffs' New York claims.

### 1.     Plaintiffs' UCC Claims

The Uniform Commercial Code as enacted in each state includes a choice-of-law provision that governs plaintiffs' UCC breach of warranty claims. Absent an agreement by the parties, the forum state's law governs if the transaction bears an "appropriate relation" to that state. Cal. Com. Code § 1301(b) (2007); 13 Pa. Cons. Stat.§ 1105(a) (2007); S.C. Code Ann. § 36-1-105 (2006). Although the language is uniform, each state has interpreted it differently. The Fourth Circuit has held that South Carolina's

"appropriate relation" language incorporates the "most significant relationship" test, which requires the court to consider various factors, including the needs of the interstate system, the relevant policies of the forum, and the relevant policies and relative interests of other interested states. See In re Merritt Dredging Co., 839 F.2d 203, 206 (4th Cir. 1988). The Pennsylvania Supreme Court has stated, albeit in dicta, that the UCC choice-of-law provision incorporates that state's usual "grouping of contacts" test. See Griffith v. United Air Lines, Inc., 203 A.2d 796, 805 & n.17 (Pa. 1964); see also Atl. Paper Box Co. v. Whitman's Chocolates, 844 F. Supp.1038, 1042 (E.D. Pa. 1994) (applying the grouping of contracts test in a UCC choice-of-law dispute). The objective of that test is to determine which state has the greatest interest in the application of its law according to the quality of the state's contacts with the transaction. See Cipolla v. Shaposka, 267 A.2d 854, 856 (Pa. 1970). Finally, California courts have not interpreted what the phrase "appropriate relation" means, but the state reporter's commentary and Ninth Circuit precedent provide that, at a minimum, a transaction bears an "appropriate relationship" if performance was to take place in California. See Cal. Com. Code § 1301(b) state cmt. 1; Barclays Discount Bank, Ltd. v. Levy, 743 F.2d 722, 725 (9th Cir. 1984).

  Each state's choice of law principles would require dismissal of plaintiffs' New York UCC claims. Although South Carolina would probably choose to apply a law other than its own to plaintiffs' claims, it is unlikely that its courts would choose to apply New York law. South Carolina has an interest insofar as the product was manufactured here, and New York has an interest only insofar as Bausch & Lomb maintains its headquarters there. Pennsylvania and California, on the other hand, have strong policy interests in

protecting their citizens against harmful and defective products. The needs of the interstate system also undermine applying New York law because Bausch & Lomb should be subject to the laws of Pennsylvania and California if it chooses to do business in those states, rather than forcing citizens of other states to submit to New York law based on transactions that occurred elsewhere.

Pennsylvania courts would similarly dismiss the New York claims under that state's "grouping of contacts test." There can be little doubt that New York has the fewest quality contacts with this litigation. Bausch & Lomb, though headquartered in New York, did not manufacture or sell the product to these plaintiffs there. Instead, Bausch & Lomb sold its product in California and Pennsylvania, plaintiffs purchased the product there, and any injury (i.e., the economic loss) occurred in those states. Finally, under California's test, the states where performance of these contracts was to (and actually did) take place were Pennsylvania and California, not New York.

### 2.     Plaintiffs' Non-UCC Claims

South Carolina continues to follow the traditional choice-of-law rule for disputes involving contracts, which provides that the law of the place the contract was made governs ("lex loci contractu"). Jones v. Prudential Ins. Co., 210 S.C. 264, 42 S.E.2d 331, 333 (1947); Oaktie Hotel Group, LLC v. Amerisure Ins. Co., 2006 WL 91577, at *2-3, *3 n.5 (D.S.C. 2006); Heslin-Kim v. CIGNA Group Ins., 377 F. Supp. 2d 527, 530-31 (D.S.C. 2005); see also 4 S.C. Jur. Action § 7 (2007) (explaining that, "[i]n contract matters, the South Carolina courts have generally followed the principle that the lex loci contractu governs the construction and interpretation of contracts" ). Pennsylvania

resolves non-UCC conflict of laws issues by determining which state has the greater interest in the application of its law. Cippolla, 267 A.2d at 855; see LeJeune v. Bliss-Salem, Inc., 85 F.3d 1069, 1071 (3d Cir. 1996). A state's interest is ascertained by looking at the quality of the contacts each state has to the case, with particular emphasis on those contacts that "relate to the 'policies and interests underlying the particular issue before the court.'" Cipolla, 267 A.2d at 856 (quoting Griffith, 203 A.2d at 805). Finally, California follows the "governmental interest" test, which first asks whether there are multiple states with interests in having their law applied to the case. If so, the test makes the choice-of-law determination by considering "which state's interests would be impaired if its policy were subordinated to the policy of the other state." N. Am. Asbestos Corp. v. Superior Court, 225 Cal. Rptr. 877, 879 (Ct. App. 1986) (citing Bernhard v. Harrah's Club, 546 P.2d 719 (Cal. 1976); Hurtado v. Superior Court, 522 P.2d 666 (Cal. 1974)); see also ABM Indus., Inc. v. Zurich Am. Ins. Co., 2006 WL 2595944, at *10-11 (N.D. Cal. 2006).

     The place of contracting in this case was certainly not New York; plaintiffs formed their contracts with defendant when they purchased ReNu in Pennsylvania and California. South Carolina law would thus choose not to apply New York law. Pennsylvania would similarly choose not to apply New York law. As discussed above, California and Pennsylvania likely have a much greater interest in this controversy given that plaintiffs are residents of those states, they purchased the product in those states, and those states have an interest in being able to regulate products sold there. Finally, California would also choose not to apply New York law because California and

Pennsylvania have strong public policies that favor in-state regulation of transactions involving consumer goods sold within their borders. It would make little sense to subordinate those robust policies to New York's relatively weak policy arising solely from its relationship with Bausch & Lomb. Accordingly, California choice-of-law principles require dismissal of the New York claims.

### B.     Factual Sufficiency

The court must also consider whether the complaint's allegations state a claim in light of the Supreme Court's recent decision in Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955 (2007). Twombly involved a suit under Section 1 of the Sherman Antitrust Act, alleging the defendant telecommunications companies unlawfully conspired to restrain trade. See id. at 1961-63. Specifically, plaintiffs alleged defendants violated the Act in two ways. First, plaintiffs alleged that defendants engaged in conscious parallel conduct that was unfair to disfavored competitors, including overcharging, providing inferior services to those competitors, and sabotaging the disfavored competitors' customer relationships. Second, plaintiffs alleged that defendants agreed not to compete with each other, as evidenced by their failure to pursue attractive business opportunities where the other defendants did business. Id. The complaint summarized its allegations by concluding that there was an agreement among defendants to stifle competition because of the lack of competition among defendants and defendants' parallel courses of conduct. Id. at 1962-63.

The district court granted defendants' motion to dismiss, concluding plaintiffs failed to sufficiently allege that defendants had agreed with each other to restrain trade.

The district court noted that conscious parallelism could not give rise to liability under Section 1 of the Act and provided that the "plaintiffs must allege additional facts that 'ten[d] to exclude independent self-interested conduct as an explanation for defendants' parallel behavior.'" Id. at 1963 (quoting Twombly v. Bell Atl. Corp., 313 F. Supp. 2d 174, 179 (S.D.N.Y. 2003). The court held the allegations that defendants agreed not to compete with each other also failed because plaintiffs failed to allege facts demonstrating that defendants were not acting in their own self-interests. Id. The Second Circuit reversed, holding that a conspiracy was "'among the realm of "plausible" possibilities'" under the facts alleged in the complaint. Id. (quoting Twombly v. Bell Atl. Corp., 425 F.3d 99, 114 (2d Cir. 2005)). The Second Circuit further explained that it was not possible to conclude that plaintiffs had set forth "no set of facts" that would support a claim under Section 1. See id.

Federal Rule of Civil Procedure 8(a) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." The Supreme Court noted that the purpose of Rule 8 is to give a defendant notice of the claims and the grounds upon which they rest. Id. at 1964. However, a plaintiff's obligation to provide the grounds for his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 1965. Even taking all of the complaint's factual allegations as true, those allegations "must be enough to raise a right to relief above the speculative level." Id. To go beyond the "speculative level," the factual allegations must make it "plausible," as opposed to merely "possible," that plaintiff is entitled to relief. Id. at 1966.

The Supreme Court held that plaintiffs had failed to sufficiently allege the existence of an agreement or conspiracy. Because parallel conduct alone cannot support a Section 1 claim, the Court ruled the complaint could not survive a Rule 12(b)(6) motion by asserting parallel conduct without additional facts showing an agreement. <u>Id.</u> at 1966. Moreover, the complaint's "bare assertion" of a conspiracy was not adequate because it did not supply the <u>facts</u> necessary to support the claim. <u>Id.</u> It was also not enough that the allegations were consistent with an agreement; the allegations had to plausibly suggest the existence of an agreement. <u>Id.</u> At bottom, the complaint could support two equally possible conclusions: (1) that the parallel conduct was the product of an illegal agreement or (2) that conscious parallelism existed, yet was not illegal because it was not the product of an agreement. <u>See id.</u> Without facts tending to make the first conclusion plausible, rather than simply possible, the Supreme Court held the district court properly granted defendants' motion to dismiss.

In the course of its discussion, the Supreme Court expressly overruled any effect the courts had ascribed to its statement in <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957), that dismissal under rule 12(b)(6) was not appropriate "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." <u>See</u> <u>Twombly</u>, 127 S. Ct. at 1968. The Court rejected that statement, seemingly because <u>Conley</u> had spawned a view among courts of appeals that "any statement revealing the theory of the claim will suffice unless its factual impossibility may be shown from the face of the pleadings." <u>Id.</u> Thus, a plaintiff can no longer survive a motion to dismiss based solely on the hopes that he "might later establish some 'set of

[undisclosed] facts' to support recovery." Id. (alteration in original). It was precisely an undisclosed fact that was essential to the plaintiffs' claims–the existence of an agreement–that required dismissal in Twombly.

Plaintiffs here face the same problem encountered by the plaintiffs in Twombly: their claims necessarily rely on undisclosed facts. Specifically, plaintiffs have failed to offer any factual allegations on whether and when they discarded their bottles of ReNu. All of plaintiffs' California and Pennsylvania claims rely on the economic loss plaintiffs purportedly suffered by having to discard the allegedly defective product.  Plaintiffs' counsel conceded at the hearing that a consumer who purchased ReNu and used all of the product without consequence suffered no loss, but noted that plaintiffs and the purported class members do not fall into that group. See Hearing Tr. at 26. Instead, plaintiffs' counsel acknowledged that this case is about "those people [who] poured it out unused." Id. The complaint, however, does not contain any factual allegations that explain plaintiffs' damages. For example, the complaint does not contain the basic allegation that any of named plaintiffs discarded any quantity of unused ReNu.

Instead, the complaint includes only conclusory statements that plaintiffs "have been monetarily injured" similar to the conclusory allegation in Twombly that the defendants had conspired to restrain trade. Like the plaintiffs in Twombly, plaintiffs here must provide some factual allegations to support their legal conclusions. Regardless of how one views Twombly's effect on notice pleading, some import must be ascribed to its requirement that the plaintiffs' claims cannot depend on the existence of undisclosed facts. Plaintiffs' complaint fails to reach this minimal pleading standard.

13

## III.   CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that defendant's motion to dismiss be **GRANTED** and that plaintiffs' claims be **DISMISSED** without prejudice.

**AND IT IS SO ORDERED**.

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**October 11, 2007**
**Charleston, South Carolina**